1  Robert S. Green (State Bar No. 136183)
   Robert A. Jigarjian (State Bar No. 171107)
2  **GREEN FAUTH & JIGARJIAN, LLP**
   235 Pine Street, 15ᵗʰ Floor
3  San Francisco, California 94104
   Telephone: (415) 477-6700
4  Facsimile: (415) 477-6710

5  **SCHIFFRIN & BARROWAY, LLP**
   Robert B. Weiser
6  Eric L. Zagar
   Three Bala Plaza East, Suite 400
7  Bala Cynwyd, PA 19004
   (610) 667-7706

8

9  Attorneys for Plaintiff

10

11            **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13
   RICHARD SUSSMAN, Derivatively on       No. _____ 02 ____ 0709
14 Behalf of Nominal Defendant
   SAGENT TECHNOLOGY, INC.,
15                                        SHAREHOLDER DERIVATIVE
              Plaintiff                   COMPLAINT FOR VIOLATION OF
16                                        CAL. CORP. CODE § 25402; BREACHES
          V.                              OF FIDUCIARY DUTIES, WASTE OF
17                                        CORPORATE ASSETS, ABUSE OF
   KENNETH C. GARDNER, BEN C.             CONTROL,     AND     GROSS
18 BARNES, JOHN E. ZICKER, SHANDA         MISMANAGEMENT
   BAHLES, KLAUS S. LUFT, ANDRE
19 BOISVERT, KEITH MAIB, IRVING H.
   LICHTENWALD, ALI JENAB, DAVID
20 N.ELIFF, THOMAS M. LOUNIBOS, W.
   VIRGINIA WALKER, RICHARD W.
21 SHAPERO, and KPMG, LLP,

22            Defendants,

23        and                            JURY TRIAL DEMANDED

24 SAGENT TECHNOLOGY, INC.,

25            Nominal Defendant.

26

27

28

   VERIFIED DERIVATIVE COMPLAINT                                -1-

**VERIFIED DERIVATIVE COMPLAINT**

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

**NATURE OF THE ACTION**

1.    This is a shareholders' derivative action brought pursuant to F.R.Civ.P. 23.1 for the benefit of nominal defendant Sagent Technology, Inc. ("Sagent" or the "Company") against its entire Board of Directors, certain executive officers, and the Company's outside auditors seeking to remedy defendants' violations of California Corporations Code § 25402, breaches of fiduciary duties, waste of corporate assets, and other violations of law.

**JURISDICTION AND VENUE**

2.    This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332. The activities of the defendants and their co-conspirators as described herein were within the flow of interstate commerce, had a substantial effect on interstate trade and commerce, and used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, telephone communications, and the facilities of the national securities markets.

3.    This Court has jurisdiction over each defendant named herein because each defendant is a corporation with its principal place of business located in this district or an individual who has sufficient minimum contacts with this district to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4.    Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district, and defendants have received substantial compensation in this district by doing business here and engaging in numerous activities which had an effect in this district.

VERIFIED DERIVATIVE COMPLAINT

-2-

**PARTIES**

5.     Plaintiff Richard Sussman, a resident of North Carolina, is, and was at all relevant times, a shareholder of nominal defendant Sagent.

6.     Nominal defendant Sagent is a Delaware corporation with its principal executive offices located at 800 W. El Camino Real, Suite 300, Mountain View, California 94040. According to its public filings, Sagent provides real-time e-business intelligence solutions that enable enterprises to improve customer acquisition and retention and operational effectiveness.

7.     Defendant Kenneth C. Gardner ("Gardner") served as a director of Sagent from June 1995 to January 2002, including serving as Chairman of the Board of Directors of Sagent (the "Board") from August 2000 until his resignation in January 2002. Gardner served as the Company's Chief Technology Officer from August 2000 until his resignation in January 2002 and as the Company's President and Chief Executive Officer from June 1995 to August 2000. From FY1999 through FY2000, Gardner received a total of $590,876 in salary and cash bonuses. Gardner serves as a director of NetAcumen, which paid Sagent a total of $924,000 during FY1999 and FY2000 for licenses and services rendered. From May 15 to 17, 2001, Gardner, while in possession of material adverse non-public information regarding the Company, sold a total of 100,000 shares of Sagent common stock, reaping proceeds of $129,390.

8.     Defendant Shanda Bahles ("Bahles") has served as a director of Sagent since May 1995. Bahles is a General Partner of El Dorado Ventures ("El Dorado"), a venture capital firm. Bahles is a member of the Audit Committee of the Board (the "Audit Committee"). From October 26, 1999 to May 17, 2001, Bahles and/or El Dorado, while in possession of material adverse non-public information regarding the Company, sold a total of 1,809,529 shares of Sagent common stock, reaping proceeds of $22,258,020.

9.     Defendant John E. Zicker ("Zicker") has served as a director of Sagent since June 1995 and previously served as the Company's Executive Vice President of Technology and Chief Technology Officer from June 1995 to September 2000. From FY1999 through FY2000, Gardner received a total of $399,043 in salary and cash bonuses. Zicker continues to provide consulting

VERIFIED DERIVATIVE COMPLAINT
-3-

services to the Company, for which he receives material fees. From October 26 to November 5, 1999, Zicker, while in possession of material adverse non-public information regarding the Company, sold a total of 80,000 shares of Sagent common stock, reaping proceeds of $752,525.

10.     Defendant Thomas M. Lounibos ("Lounibos") served as Executive Vice President of Sales and Marketing from 1998 until March 2000. In FY1999, Lounibos received a total of $422,862 in salary and cash bonuses. From October 25, 1999 to February 29, 2000, Lounibos, while in possession of material adverse non-public information regarding the Company, sold a total of 317,097 shares of Sagent common stock, reaping proceeds of $4,526,010.

11.     Defendant W. Virginia Walker ("Walker") served as Sagent's Executive Vice President of Finance and Administration and Chief Financial Officer from 1998 to May 2000. From FY1999 through FY2000, Walker received a total of $413,919 in salary and cash bonuses and options to purchase 70,000 shares of Sagent common stock. From October 26 to November 5, 1999, Walker, while in possession of material adverse non-public information regarding the Company, sold a total of 18,372 shares of Sagent common stock, reaping proceeds of $250,642.

12.     Defendant Richard W. Shapero ("Shapero") served as a director of Sagent from May 1995 to September 2000. On November 2, 1999, Shapero, while in possession of material adverse non-public information regarding the Company, sold a total of 34,152 shares of Sagent common stock, reaping proceeds of $587,080.

13.     Collectively, the defendants identified in paragraphs 7-12 will be referred to herein as the "Selling Defendants."

14.     Defendant Ben C. Barnes ("Barnes") has served as a director of Sagent and as the Company's President and Chief Executive Officer since August 2000. In FY2000, Barnes received a total of $946,452 in salary and cash bonuses, 150,000 shares of Sagent restricted stock, and options to purchase 750,000 shares of Sagent common stock.

15.     Defendant Klaus S. Luft ("Luft") has served as a director of Sagent since April 1999. In November 1999, Sagent acquired Sagent France S.A. ("Sagent France"), the Company's distributor in France, and Sagent Technology GmbH ("Sagent Germany"), the Company's

VERIFIED DERIVATIVE COMPLAINT                                                                    -4-

distributor in Germany, from a partnership in which Luft served as a general partner. Luft's interest in the consideration paid for the acquisitions was 11.85%, or approximately $331,800. During FY2000, Luft sublet property to Sagent Germany and received rental payments of approximately $35,000. During FY2000, Sagent Germany provided consulting services to Luft, for which Sagent Germany received approximately $130,000. Luft is a party to license and maintenance agreements with Sagent Germany.

16. Defendant Andre Boisvert ("Boisvert") has served as a director of Sagent since April 2001 and as Chairman of the Board since January 2002. Boisvert is a member of the Audit Committee.

17. Defendant Keith Maib ("Maib") has served as a director of Sagent since July 1999. Maib is a member of the Audit Committee.

18. Defendant Irving H. Lichtenwald ("Lichtenwald") has served as a director of Sagent since September 2001.

19. Defendant Ali Jenab ("Jenab") has served as a director of Sagent since November 2001.

20. Defendant David N. Eliff ("Eliff") served as Sagent's Executive Vice President of Finance and Administration and Chief Financial Officer from May 2000 to November 2001. During FY2000, Eliff received $127,901 in salary and options to purchase 350,000 shares of Sagent common stock.

21. Collectively, the defendants identified in paragraphs 7-12 and 14-20 will be referred to as the "Individual Defendants." The Individual Defendants, through their positions as directors and/or officers of the Company and their receipt of reports, attendance at meetings, and access to all of the Company's books, records and other proprietary information, had responsibility for and therefore were in possession of material non-public information concerning the Company and its operations, finances and business prospects. This material, non-public information included, but was not limited to, the Company's financial condition and growth prospects.

VERIFIED DERIVATIVE COMPLAINT                                    -5-

22.     Defendant KPMG, LLP ("KPMG") is a public accounting firm that served as Sagent's outside auditor at all times relevant hereto.

### DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers, directors, and/or fiduciaries of Sagent and because of their ability to control the business and corporate affairs of Sagent, the Individual Defendants owed Sagent and its shareholders fiduciary obligations of trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Sagent in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sagent and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Sagent and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, services, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sagent, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Sagent, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and future business prospects of Sagent.

25.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sagent, and was at all times acting within the course and scope of such agency.

VERIFIED DERIVATIVE COMPLAINT                                                                    -6-

26.     To discharge their duties, the officers and directors of Sagent were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Sagent were required to, among other things:

a.     ensure that the affairs of Sagent were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

b.     exercise good faith in establishing and maintaining systems that would allow them to obtain the information necessary to supervise, manage and control Sagent's operations prudently, and, when they were put on notice of potential problems at Sagent, to investigate such problems and take affirmative steps to remedy the problems;

c.     exercise good faith in remaining informed regarding the affairs of Sagent, including, but not limited to, Sagent's internal accounting controls, accounting under Generally Accepted Accounting Principles ("GAAP"), and revenue recognition policies and procedures;

d.     exercise good faith in supervising the preparation and filing of all audits, reports, and other financial information required by law, including periodic financial statements and reports filed with the Securities and Exchange Commission ("SEC"), and in examining and evaluating such audits, reports, and other information concerning the financial affairs of the Company;

e.     ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public; and

f.     refrain from acting upon material inside corporate information to benefit themselves.

27.     The Individual Defendants were responsible for establishing and maintaining adequate internal accounting controls for Sagent and for ensuring that the Company's financial statements were based on accurate financial information.  According to SEC rules, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.  Pursuant to §13(b)(2) of the Exchange Act, Sagent was required to:

(a)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(b)     devise and maintain a system of internal accounting controls sufficient to

VERIFIED DERIVATIVE COMPLAINT

-7-

provide reasonable assurances that –

    (i)    transactions are executed in accordance with management's general or specific authorization;

    (ii)    transactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles. . . .

28.    Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

29.    According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility.  To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

30.    As alleged in detail below, during the period from 1999 to 2001, the Individual Defendants, in violation of GAAP and SEC rules and regulations, failed to implement and maintain an adequate internal accounting control system, and thereby violated their fiduciary duties of loyalty, good faith, and due care.

31.    The Individual Defendants further breached their duties of loyalty, due care and good faith by: (i) causing or allowing the Company to conduct its business in an unsafe, imprudent and unlawful manner; (ii) causing or allowing the Company to violate federal securities laws by making materially false and misleading statements and issuing false financial statements; and (iii) exposing Sagent to tens of millions of dollars of losses, as alleged herein.

32.    Furthermore, as a result of their responsibility for, and access to, material non-public information regarding the Company's financial condition, the Individual Defendants knew that the

VERIFIED DERIVATIVE COMPLAINT

-8-

market had been misled by the Company's public disclosures as to the Company's financial results and condition. The Individual Defendants caused the Company to conceal from the investment community, including the Company's public stockholders, the Company's true financial results and condition, which allowed the Selling Defendants to reap insider trading profits through concealment.

33.     As alleged in detail below, from 1999 to 2001, when the Selling Defendants had material non-public adverse information regarding the Company's financial results and condition, the Selling Defendants breached their fiduciary duties of loyalty and good faith by using material non-public information to sell millions of shares of Sagent common stock at artificially inflated prices, thereby reaping tens of millions of dollars in illegal insider trading proceeds for their personal gain.

34.     The Individual Defendants were responsible for authorizing, or permitting the authorization of, or failing to monitor, the practices which resulted in the Selling Defendants' misappropriation of confidential corporate information for their own gain. The Individual Defendants breached their duties of loyalty and good faith by allowing the Selling Defendants to place their own personal interests above the Company's and by failing to prevent the Company and its officers and directors from committing acts which would, and did, injure the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties as alleged herein.

36.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) maintain the Individual Defendants' executive and directorial positions at Sagent and the profits, power and prestige which the Individual Defendants enjoyed as a result of these positions; (ii) deceive the investing public, including shareholders of Sagent, regarding the Individual Defendants' management of Sagent's

operations, financial health and stability, and future business prospects; and (iii) artificially inflate the market price of Sagent common stock. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct commencing in 1999 and continuing at least until 2001, during which time the Individual Defendants caused the Company to make inaccurate statements about Sagent's financial performance and future business prospects, while at the same time allowing the Selling Defendants to reap more than $28.5 million in proceeds from their stock sales.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, abuse of control, and gross mismanagement; to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to artificially inflate the price of Sagent common stock so they could: (i) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained thereby; and (ii) allow the Selling Defendants to reap substantial personal profits from the sale of Sagent common stock.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to make inaccurate statements about the Company's financial performance and future business prospects, which had the effect of artificially inflating the price of Sagent common stock. Each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

VERIFIED DERIVATIVE COMPLAINT                                                          -10-

# FACTUAL ALLEGATIONS

## Sagent Disseminates Materially Misleading and Inaccurate Information as the Selling Defendants Trade on Inside Information

41.     On October 21, 1999, Sagent issued a press release announcing its financial results for the third quarter of 1999, reporting revenues of $10 million and net income of $0.03 per share. In the press release, defendant Gardner stated:

> The revenue growth we have achieved has been tremendous. Our revenues have increased each quarter by more than 100% from the comparable period in the previous year and have grown sequentially for each of the eleven quarters since we began shipping Sagent products. Achieving profitability this quarter represents a major milestone for Sagent and it is particularly gratifying because that milestone was achieved on significant license revenue growth. Our revenue growth this quarter was driven by the strong demand for Sagent's complete E-Business Intelligence Solution. Customers are choosing Sagent because we are the only company in the market today offering a complete, tightly integrated, scalable E-Business Intelligence Solution from a single vendor.

42.     Sagent's October 21, 1999 announcement had an immediate material effect on the price of Sagent common stock, which rose more than 44%, from $9.75 to $14.06, from October 21 to 25, 1999.

43.     Beginning on October 25, 1999, just two trading days after Sagent's October 21 announcement caused the price of Sagent common stock to rise, and continuing until November 5, 1999, the Selling Defendants, while in possession of material adverse non-public information regarding the Company, sold more than 1.4 million shares of Sagent common stock, reaping proceeds exceeding $20.5 million, as follows:

| Name | Dates | # Shares | Prices | Proceeds |
|---|---|---|---|---|
| Shanda Bahles | 10/26/99-11/3/99 | 999,762 | $13.55-$18.04 | $15,011,662 |
| Thomas Lounibos | 10/25/99-11/1/99 | 286,097 | $13.20-$14.56 | $3,950,080 |
| John Zicker | 10/26/99-11/5/99 | 80,000 | $13.94-$20.10 | $752,525 |
| Virginia Walker | 10/26/99-11/5/99 | 18,372 | $13.63-$19.00 | $250,642 |
| Richard Shapero | 11/2/99 | 34,172 | $16.16-$17.75 | $587,080 |

44.     On January 19, 2000, Sagent issued a press release announcing its financial results for the fourth quarter of 1999, reporting revenues of $16 million and net income of $0.03 per share. In the press release, defendant Gardner stated:

> Sagent continued its tremendous revenue growth into the fourth quarter. Our revenues this quarter were driven by the strong demand for Sagent's complete Real-time eBusiness Intelligence solution. Customers are choosing Sagent because we are the only company in the market today offering a complete, scalable, single-vendor solution for helping businesses understand and act on customer and operational information.

45.     Beginning on January 24, 2000 and continuing until February 29, 2000, the Selling Defendants, while in possession of material adverse non-public information regarding the Company, again sold hundreds of thousands of shares of Sagent common stock and reaped millions of dollars of proceeds, as follows:

| Name | Dates | # Shares | Prices | Proceeds |
|------|-------|----------|--------|----------|
| Shanda Bahles | 1/24/00-2/9/00 | 309,767 | $20.17-$24.14 | $6,650,058 |
| Thomas Lounibos | 2/18/00-2/29/00 | 31,000 | $17.00-$19.75 | $575,930 |

46.     The stock sales set forth in paragraphs 43 and 45 were not part of any normal or regular pattern or practice of such sales by the Selling Defendants, but rather were unusual in timing and amount.

47.     At the time of the stock sales set forth in paragraphs 43 and 45, each of the Individual Defendants knew that:

    a.   Sagent was routinely shipping incomplete, defective, and/or non-functional products to customers, which customers were returning and/or refusing to pay for;

    b.   Sagent was improperly recognizing revenue on sales of the aforementioned defective products when collection of payment for the products was not reasonably probable;

    c.   Sagent was not adequately reserving for bad debts and uncollectible accounts receivable;

    d.   contrary to both GAAP and Sagent's internal revenue recognition policy, Sagent was improperly recognizing license royalty revenue on sales of technology to original equipment manufacturers ("OEM's") (including, but not limited to, CommerceOne, Siebel Systems, and Interpath) prior to the

VERIFIED DERIVATIVE COMPLAINT                                                    -12-

1    licensed technology being successfully integrated with the OEM's products
     and sold through to end users;

     e.    Sagent's internal accounting was so deficient and disorganized that the
           Accounting Department could not provide senior management with accurate
           sales figures; and

     f.    demand for Sagent's products was not strong, and was declining rapidly, as
           Sagent's salespeople were reporting to senior management that they would not
           be able to meet their sales quotas for the first quarter of 2000.

     48.    On January 20, 2000, Donaldson, Lufkin & Jenrette analyst Joseph Farley ("Farley")

issued a report on Sagent after participating in a conference call with Sagent senior management,

including defendants Gardner and Walker. Farley reported that, "[m]anagement was extremely

positive on the conference call about the demand for its products and the pipeline in the upcoming

quarter."

     49.    On February 18, 2000, Farley issued another report on Sagent after speaking with

senior management, including defendants Gardner and Walker. Farley reported:

     Checks over the last few days with the management at Sagent Technology as well as with our
     sales and other contacts suggest to us that business for the quarter is tracking to plan. We
     believe that the business remains healthy and the pipeline is robust. . . . The company is on
     track to, at least, meet our expectations for the quarter. For first quarter 2000, we are looking
     for revenues to grow 94% to $17.4 million fueled by strong license revenue growth of 94%
     or $12.8 million. We estimate that fully diluted EPS should come in at $0.04 vs. $(0.05) a
     year ago.

## The Truth Begins to be Revealed

     50.    On April 18, 2000, Sagent issued a press release which stated in pertinent part:

     Net revenue for the first quarter of 2000 was $14.5 million, up 62% from the $8.9 million
     reported in the first quarter of 1999. Net loss for the first quarter of 2000 was $2.0 million or
     a loss of $0.07 per basic and diluted share on 28.0 million shares and 27.8 million shares,
     respectively. . . . "We are disappointed to have missed our revenue and earnings targets for
     the quarter," said Ken Gardner, president and CEO. "In our Q1 review with our public
     accountants, which was completed on Monday, we determined that two signed agreements,
     totaling $3.5 million, did not qualify for revenue recognition in the first quarter. We expect to
     recognize this revenue during the remaining quarters of this year."

     51.    Sagent's April 18, 2000 announcement had an immediate material effect on the price

of Sagent common stock, which plunged more than 60%, from $18.125 to $7.22, on April 19, 2000.

     52.    Upon revelation of the true adverse conditions affecting the Company and its growth

prospects, several Sagent shareholders commenced securities fraud class actions against the

VERIFIED DERIVATIVE COMPLAINT                                                    -13-

Company and its senior executive officers (naming as defendants some of the Individual Defendants in the instant action), alleging that the Company's public disseminations were materially false and misleading in violation of federal securities laws. These class actions have and will continue to expose the Company to enormous liability and costs.

### Sagent Continues to Disseminate Misleading and Inaccurate Information

53.     On May 10, 2000, Sagent announced that defendant Eliff had been hired as Chief Financial Officer to replace defendant Walker, who had left the Company.

54.     On July 17, 2000, Sagent announced its financial results for the second quarter of 2000, reporting revenues of $17.5 million and net income of $0.05 per share.

55.     On August 8, 2000, Sagent announced that defendant Barnes had been hired as Chief Executive Officer to replace defendant Gardner, who became Chairman of the Board.

56.     On October 12, 2000, Sagent issued a press release which stated in pertinent part:

Sagent Technology, Inc. (Nasdaq:SGNT) said today that it expects third quarter 2000 revenues and earnings to be lower than the company's earlier expectations.

The company expects to report revenues in the range of $13.5 million to $14 million for the third quarter, and a pro forma loss per share from continuing operations in the range of $0.19 to $0.21 per share on approximately 29 million shares outstanding. This compares to revenues of $13.1 million and a loss of $0.02 per share on approximately 27.5 million shares outstanding reported for the third quarter of 1999. In addition, the company will take a non-recurring charge of an additional ($0.06) per share associated with the recruitment and hiring of new management.

"We are very disappointed in our quarterly revenue performance," said Ben Barnes, president and CEO. "Strengthening our sales execution has been my top priority since joining the company in mid-August, and we are making progress. We are hiring, training and deploying experienced salespeople as quickly as is practical. I pledge to our shareholders that everyone here at Sagent is committed to dramatically improving our execution as quickly as possible."

57.     On October 24, 2000, Sagent issued a press release which stated in pertinent part:

Sagent Technology, Inc. (Nasdaq: SGNT), today announced results for the company's third quarter ended Sept. 30, 2000.

Sagent's net revenue for the third quarter of 2000 was $13.8 million, compared with revenue of $13.1 million reported in the third quarter of 1999. Sagent's net loss for the third quarter of 2000, excluding non-recurring charges associated with the recruitment and hiring of new management, was $6.9 million, or a loss of $0.24 per share, compared with a net loss of $516,000, or a loss of $0.02 per share in the third quarter of 1999. Including the charges of $1.5 million related to new management, the net loss for the third quarter of 2000 was $8.4 million, or a loss of $0.29 per diluted share.

VERIFIED DERIVATIVE COMPLAINT

-14-

"I have initiated several key short-term objectives here at Sagent, designed to streamline our organization and to improve our sales execution, while we continue to work aggressively to better serve our customers," said Ben Barnes, president and CEO. "This company is focusing on growth opportunities and on building profitability. I look forward to updating you on our progress each quarter."

58.    On November 13, 2000, *The Wall Street Transcript* published an interview with defendant Barnes during which he stated that:

a.    Defendant Eliff was hired as CFO to "bring a lot more rigor in terms of not only financial control, but overall operational control."

b.    He would be hiring an entirely new management team for sales and marketing.

c.    Sagent had to "transition into a more mature and disciplined company."

d.    He was "focused on fixing, correcting, or enhancing . . . the sales and marketing effort."

e.    Sagent needed to recognize "that if you really want to scale and become a large company, there has to be some amount of both strategic planning and financial discipline. You can't do this by the seat of your pants, so to speak."

Thus, Barnes essentially admitted that Sagent's financial controls were inadequate and had to be overhauled.

59.    On February 5, 2001, Sagent issued a press release announcing its financial results for the fourth quarter of 2000, reporting revenues of $12.3 million and a net loss of $(0.37) per share. The press release stated in pertinent part:

"During my first five months at Sagent, I have devoted a significant amount of time and energy re-building and revitalizing the sales and marketing organizations," said Ben Barnes, president and CEO, Sagent. "We have been very successful in recruiting some of the industry's most talented business intelligence sales and marketing individuals. Our new team is now fully staffed and engaged in the marketplace."

"In addition to changes in the direct sales team, we have established a new telemarketing organization to market to our vast customer base and a new business development organization to establish partnerships with industry leaders," Barnes added.

"We're already beginning to see the benefits of our reorganization and recruiting efforts," Barnes said. "Sagent's new accounts in the United States during the fourth quarter included wins at IBM, Microsoft, Yahoo!, U.S. National Gallery, and the City of Santa Clara, among others."

"Internationally, we are gaining traction," Barnes said, "particularly in Asia Pacific, where we won 26 new accounts in the fourth quarter alone, including Japan Telecom, Fujitsu and

Singapore Health. We also just brought on a new executive vice president and president for Europe, who previously led IBM's European business intelligence solutions division, to help us further penetrate market opportunities in Europe."

"In addition to growing revenues during fiscal 2001, a key objective continues to be maximizing shareholder value," said David Eliff, executive vice president and CFO, Sagent. "As a result, we've recently taken steps to streamline our operations and significantly reduce our operating costs. This should speed our return to profitability."

"We are also pleased to announce that we are in final negotiations for significant additional funding to be completed in the next few weeks, which includes a group of influential financial investors and a strategic partner," Eliff said. "This additional funding improves our cash position and strengthens our balance sheet, providing the working capital to allow our new management team to execute as planned."

"Additionally, we are beginning to see the results of our recently developed analytical solutions framework in such markets as financial services and insurance, including a Q4 win at Provident Federal Credit Union," Barnes said. "Business intelligence and analytic applications represent a large market opportunity, and we intend to take full advantage of this in 2001."

60.    On May 10, 2001, Sagent announced its financial results for the first quarter of 2001, reporting revenues of $11 million and a net loss of $(0.30) per share.

61.    From May 15 to 17, 2001, the Selling Defendants, while in possession of material adverse non-public information regarding the Company, again sold hundreds of thousands of shares of Sagent common stock, as follows:

| Name | Dates | # Shares | Prices | Proceeds |
|------|-------|----------|--------|----------|
| Shanda Bahles | 5/16/01-5/17/01 | 500,000 | $1.14-$1.24 | $596,300 |
| Kenneth Gardner | 5/15/01-5/17/01 | 100,000 | $1.26-$1.43 | $129,390 |

These stock sales were not part of any normal or regular pattern or practice of such sales by the Selling Defendants, but rather were unusual in timing and amount.

62.    At the time of the stock sales set forth in the preceding paragraph, each of the Individual Defendants knew that:

a.    defendants Barnes and Eliff did not "bring a lot more rigor" to Sagent's internal accounting and operational controls, as Sagent's internal controls were as lax and deficient as they had ever been;

b.    Sagent was not "speed[ing] [its] return to profitability," but rather would continue to report losses for the foreseeable future due to poor demand for its

VERIFIED DERIVATIVE COMPLAINT

-16-

products; and

c.  Sagent's reported sales figures were materially inaccurate and misleading, as they included millions of dollars of bogus sales to government agencies.

63.  On May 17, 2001, *InfoWorld Daily News* published an interview with defendant Barnes during which he stated:

When I got here, not only was there no business development going on but the direct sales force was in disarray. A number of bad hires had been made. I have replaced all the senior management except for the founder, who's now working only on technology. I have a new CFO, a new senior head of sales, a new general manager of Europe, and we've replaced all the area vice presidents in the United States. So what keeps me up at night is how long will it take this transition, which is pretty dramatic, to get traction and begin to show the revenue top-line growth that I know that this team can deliver? My analogy would be to a football team. I'm the new coach. I've got a lot of new players; we've got a new playbook. So the question is how long is it going to take us before we begin to execute well as a new management team and a new sales team?

64.  On August 2, 2001, Sagent issued a press release announcing its financial results for the second quarter of 2001, reporting revenues of $13.3 million and a net loss of $(0.15) per share. The press release stated in pertinent part:

"Our hard work is beginning to show positive results, and I am pleased with the momentum demonstrated this quarter," said Ben Barnes, president and CEO, Sagent. "We have brought in experienced business intelligence sales and marketing management; developed a clear and concise strategy and product roadmap; begun important initiatives with business partners; and substantially reduced our operating costs."

. . .

"Our direct sales force brought on-board more than 50 new customers during the second quarter," Barnes said. "We are pleased with the overall strength and financial health of our blue-chip customer base."

. . .

Sagent provides the following guidance for the third quarter, ending Sept 30, 2001: revenues are expected to increase sequentially to between $14 million and $15 million, with a net loss before amortization of stock-based compensation, goodwill, and interest and taxes expected to be in the range of $0.08 to $0.10 per share.

65.  On October 30, 2001, Sagent issued a press release announcing its financial results for the second quarter of 2001, reporting revenues of $14.5 million and a net loss of $(0.18) per share. The press release stated in pertinent part:

"The third quarter was a challenging one for Sagent. Having been one of the only organizations in the Business Intelligence market to achieve growth in Q2 over Q1, we were tasked with meeting even higher expectations during Q3, a time of economic uncertainty,

VERIFIED DERIVATIVE COMPLAINT                                                          -17-

even before the September 11 terrorist attacks," said Ben Barnes, president and CEO, Sagent. "I am proud to say that Sagent employees worldwide rallied in the face of this adversity and continued to close deals through the end of the quarter leading us to meet our revenue expectations."

. . .

For the fourth quarter 2001, Sagent expects to see revenues in the range of $16 million range, with gross margins in the range of 75 percent and a net loss before depreciation, amortization of stock-based compensation, and goodwill, asset impairment and charges, interest and taxes in the range of $0.04 to 0.06 per share.

## Sagent Restates Its Financial Results for Each of the First Three Quarters of 2001

66.     On November 14, 2001, Sagent issued a press release which stated in pertinent part:

Sagent (Nasdaq:SGNT), a leading provider of enterprise Business Intelligence solutions, today announced it is currently conducting an internal investigation of the validity of sales orders to government agencies booked by a single sales person in the Washington, D.C., office.

The company has discovered information indicating that a sales order totaling $1.1 million recognized as revenue in the third quarter of 2001 may not be valid. As a result of this information, Sagent is reviewing all sales orders booked by the same individual for which revenue has been booked but payment has not yet been received. If these sales orders are found to be invalid, there is potential for a restatement of revenues recognized in the first nine months of 2001 totaling $4.9 million. It is possible that a restatement and the failure to collect anticipated receivables would have a material effect on the company. At this point in time, Sagent has no reason to believe that this matter will affect the previously reported December 31, 2000 results. Sagent is reviewing actions necessary, including additional expense reductions, to ensure that the company continues toward its previously stated goals for profitability and liquidity. At this point in time, the company does not have information, nor does it expect, that other sales orders not attributable to this individual are similarly affected. Sagent is working diligently toward completing its investigation in a timely fashion. Upon completion of the investigation and a thorough review of all of the facts, Sagent will hold a conference call to discuss its findings.

67.     Sagent's November 14, 2001 announcement had an immediate material effect on the price of Sagent common stock, which fell nearly 39%, from $1.29 to $0.79, on November 15, 2001.

68.     On November 15, 2001, Sagent announced that it had hired Steven R. Springsteel to replace defendant Eliff as Chief Financial Officer. Thus, Springsteel is the Company's third CFO in the last 18 months.

69.     On November 28, 2001, Sagent issued a press release which stated in pertinent part:

Sagent (Nasdaq:SGNT), a leading provider of enterprise Business Intelligence solutions, today announced it is revising revenues for the first nine months of 2001 as a result of an internal investigation into the validity of sales orders to various government agencies.

VERIFIED DERIVATIVE COMPLAINT                                                          -18-

The investigation efforts led by Sagent in conjunction with its outside counsel and independent accountants, confirmed that sales orders booked by one of its employees in its Washington, D.C. office to government agencies from the first through third quarters of 2001, totaling approximately $5 million, were forged and determined to be invalid. Sagent is reducing its first quarter reported revenue from $11.0 million to $10.3 million, its second quarter reported revenue from $13.3 million to $12.5 million, and its previously announced third quarter revenue from $14.5 million to $11.4 million. See the attached financial statements for further disclosure.

Sagent will be notifying the affected government agencies of the results of the company's investigation and will pursue legal action against the responsible employee. The company believes that the booking of the fraudulent sales orders is limited to the one individual and does not have information, nor does it expect, that other sales orders not attributable to this individual are similarly affected. In the forthcoming weeks, Sagent will reduce its headcount by approximately 20 percent and will initiate other cost reductions to achieve its previously stated goals for profitability and liquidity of EBITDA breakeven in Q2 2002, and EPS and cash flow positive in Q3 2002.

On November 21, 2001, Sagent was notified by the NASDAQ Listing Qualifications Department that it has become subject to NASDAQ delisting procedures as a result of the company's failure to file the Form 10-Q for the third fiscal quarter ending September 30, 2001, in accordance with NASDAQ Rule 4310(e)(14). The Sagent Form 10-Q for this period was not filed due to the previously discussed investigation of certain sales orders. The company's trading symbol has been appended with an "E", beginning November 26, 2001. The company is working cooperatively with the NASDAQ staff and has requested a hearing with the NASDAQ Listing Qualifications Panel. As a result of this hearing, any action by the NASDAQ to delist the company's common stock will be stayed pending a decision by the NASDAQ Listing Qualifications Panel. The company believes that these actions will provide adequate time for Sagent to complete and file the September 30, 2001 10-Q and restated 10-Q's for the first and second quarters of 2001.

70.     On November 28, 2001, Sagent announced that it was restating its results for each of the first three quarters of 2001 as follows:

| | Revenues (millions) | | Earnings (Loss) Per Share | |
|---|---|---|---|---|
| | as Reported | as Restated | as Reported | as Restated |
| First Quarter | $11.0 | $10.3 | $(0.30) | $(0.32) |
| Second Quarter | $13.3 | $12.5 | $(0.17) | $(0.19) |
| Third Quarter | $14.5 | $11.4 | $(0.24) | $(0.31) |

71.     By restating its financial results for each of the first three quarters of 2001, Sagent has admitted that its results were materially inaccurate when reported.

72.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Sagent common stock currently trades at approximately $1 per share, a stunning *96% less* than its value two years ago. In total, the Individual Defendants are directly responsible for Sagent's loss of

VERIFIED DERIVATIVE COMPLAINT                                                    -19-

nearly *$1 billion* in market capitalization.

## KPMG's Role in Defendants' Misconduct

73.     During its yearly audits and quarterly reviews of Sagent's books, records and financial statements, members of KPMG's engagement team had virtually limitless access to information concerning Sagent's true financial condition.  KPMG was present at Sagent's headquarters frequently throughout the year, had unfettered access to Sagent documents and employees, and had conversations with Sagent management and employees about Sagent's financial reporting and accounting practices.

74.     KPMG knew or recklessly disregarded that Sagent's accounting practices were not in conformity with GAAP and failed to conduct audits of Sagent's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS").

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

75.     Plaintiff brings this action derivatively in the right and for the benefit of Sagent to redress injuries suffered and to be suffered by Sagent as a result of the statutory violations, breaches of fiduciary duty, violations of law, waste of corporate assets, abuse of control, and gross mismanagement, as well as the aiding and abetting thereof, by the Individual Defendants.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

76.     Plaintiff will adequately and fairly represent the interests of Sagent and its shareholders in enforcing and prosecuting its rights.

77.     Plaintiff is an owner of Sagent common stock and was an owner of Sagent common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

78.     As a result of the facts set forth herein, and additionally pursuant to California Corporations Code §800(b)(2), plaintiff has not made any demand on the Sagent Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

VERIFIED DERIVATIVE COMPLAINT                                                          -20-

A.   Three Board members, defendants Gardner, Bahles, and Zicker, directly benefitted from their improper conduct when they sold Sagent common stock while in possession of material, adverse non-public information, collectively reaping proceeds in excess of $23 million. Accordingly, defendants Gardner, Bahles, and Zicker are directly interested in the transactions that are the subject of this action, and therefore are legally incapable of considering a demand to commence and vigorously prosecute this action;

B.   The principal professional occupation of defendant Barnes is his employment with Sagent, pursuant to which he has received and will continue to receive substantial monetary compensation and other benefits. Accordingly, defendant Barnes is therefore beholden to the other members of the Board to maintain his employment position with Sagent, which renders him incapable of impartially considering a demand to commence and vigorously prosecute this action;

C.   Defendant Luft has a long-standing pattern of mutually advantageous business relationships with Sagent and Sagent Germany, as described herein, which renders him incapable of impartially considering a demand to commence and vigorously prosecute this action;

D.   Despite their knowledge of the wrongdoing alleged herein, the directors of Sagent have not taken action to seek recompense from the wrongdoers who have caused harm to the Company, including, but not limited to, the Selling Defendants;

E.   There is a substantial likelihood that the members of the Audit Committee, defendants Bahles, Boisvert, and Maib, will be held personally liable for damages the Company has sustained and will sustain as a result of their breaches of fiduciary duties; and

F.   Sagent's directors' and officers' liability insurance coverage has an "insured vs. insured" exclusion. Thus, if the Individual Defendants caused Sagent to sue its officers and directors for the liability asserted in this case, they would not be insured for that liability. They will not do this to themselves. The Sagent officers' and directors' liability insurance was purchased and paid for with corporate funds for the protection of the corporation. This derivative action does not trigger the "insured vs. insured" exclusion, and therefore only this derivative action can obtain a recovery from Sagent's officers' and directors' insurance for the benefit of the corporation.

## COUNT I

### AGAINST THE SELLING DEFENDANTS FOR VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTION 25402

79.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

80.   At the time of the stock sales set forth herein, each of the Selling Defendants knew the information described in paragraphs 47 and 62 above.

VERIFIED DERIVATIVE COMPLAINT                                                    -21-

81.     The information described in paragraphs 47 and 62 was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Selling Defendants used for their own benefit when they sold Sagent common stock at prices higher than they could have obtained had the market been aware, as they were, of the true state of the Company's finances and future prospects.

82.     In selling shares of Sagent common stock while in possession of material adverse non-public information, the Selling Defendants violated California Corporations Code Section 25402, and are therefore liable to Sagent pursuant to California Corporations Code Section 25502.5(a) for damages in an amount equal to three (3) times the difference between the prices at which the Selling Defendants sold their Sagent shares and the market value at which such shares would have sold had the material non-public adverse information known to the Selling Defendants been publicly disseminated.

## COUNT II

### AGAINST THE SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

83.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

84.     At the time of the stock sales set forth herein, the Selling Defendants knew or had reason the information described in paragraphs 47 and 62 above.

85.     The information described in paragraphs 47 and 62 was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Selling Defendants used for their own benefit when they sold Sagent common stock at prices higher than they could have obtained had the market been aware, as they were, of the true state of the Company's finances and future prospects.

86.     At the time of their stock sales, the Selling Defendants knew that the Company's business and prospects were diminishing, which when reported would cause the price of the Company's common stock to dramatically decrease.  The Selling Defendants' sales of Sagent

VERIFIED DERIVATIVE COMPLAINT

-22-

common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

87.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Selling Defendants obtained thereby.

88.     Plaintiff has no adequate remedy at law.

### COUNT III

### AGAINST ALL INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTIES FOR DISSEMINATION
### OF MISLEADING AND INACCURATE INFORMATION

89.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

90.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Sagent disseminated accurate information to the market.

91.     Each of the Individual Defendants violated the fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to the market materially misleading and inaccurate information through public statements, as alleged herein.

92.     Each of the Individual Defendants failed to disclose the material adverse information described herein so that the Company's stock price would trade at artificially inflated prices and the Selling Defendants could sell their personal holdings of Sagent common stock at inflated prices.

93.     Each of the Individual Defendants failed to correct the Company's publicly reported financial results and guidance, and aided and abetted in the Selling Defendants' use of material adverse non-public information to sell their personal holdings of Sagent common stock at inflated prices. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

94.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Sagent has suffered damages, including, but not limited to, damages associated with the Selling Defendants' stock sales, the Company's internal investigation and restatement of

VERIFIED DERIVATIVE COMPLAINT

-23-

1   financial results.

2       95.    Plaintiff has no adequate remedy at law.

3   **COUNT IV**

4   **AGAINST ALL INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS**

5       96.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set

6   forth fully herein.

7       97.    During the term of the wrongdoing alleged herein, the Individual Defendants

8   occupied positions within the Company that made them privy to confidential, proprietary

9   information concerning the Company's financial condition and future business prospects, as

10  described herein.  The foregoing information was a proprietary asset belonging to the Company,

11  which the Selling Defendants, aided and abetted by the remaining Individual Defendants, used for

12  their own benefit and to the detriment of the Company and its shareholders.

13      98.    The Company received no consideration in exchange for the Selling Defendants' use

14  of the Company's confidential, proprietary information concerning its financial condition and future

15  business prospects.

16      99.    Each of the Individual Defendants individually and/or jointly committed one or more

17  of the acts or omissions to act as alleged herein and aided and abetted in the Selling Defendants' use,

18  without consideration to the Company, of material adverse non-public information to sell their

19  personal holdings of Sagent common stock at inflated prices for their own benefit and to the

20  detriment of the Company and its shareholders, which constituted a waste of corporate assets.

21      100.    As a direct and proximate result of the Individual Defendants' waste of corporate

22  assets as alleged herein, Sagent has sustained damages, as alleged herein.

23      101.    Plaintiff has no adequate remedy at law.

24  ///

25  ///

26  ///

27  ///

28

VERIFIED DERIVATIVE COMPLAINT                                                 -24-

1

2
3

## COUNT V

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH
OF FIDUCIARY DUTY FOR FAILURE TO ESTABLISH
AND MAINTAIN ADEQUATE ACCOUNTING CONTROLS**

4        102.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set

5   forth fully herein.

6        103.    As alleged in detail herein, each of the Individual Defendants had a duty to Sagent

7   and its shareholders to establish and maintain adequate internal accounting controls to ensure that the

8   Company's financial results were recorded in compliance with GAAP and SEC rules and regulations.

9        104.    The Individual Defendants did not establish and maintain adequate internal

10   accounting controls at Sagent and did not make a good faith effort to do so; thus, they abdicated their

11   responsibilities to prudently supervise the operations of Sagent and its senior management.

12        105.    As a direct and proximate result of the Individual Defendants' failure to perform  their

13   fiduciary obligations, Sagent engaged in imprudent and unlawful activities which have caused

14   Sagent to suffer damages, as alleged herein.

15        106.    Plaintiff has no adequate remedy at law.

16

## COUNT VI

17

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

18        107.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set

19   forth fully herein.

20        108.    The Individual Defendants' misconduct alleged herein constituted an abuse of their

21   ability to control and influence Sagent, for which they are legally responsible.

22        109.    As a direct and proximate result of the Individual Defendants' abuse of control,

23   Sagent has sustained damages, as alleged herein.

24        110.    Plaintiff has no adequate remedy at law.

25

26   ///

27   ///

28   ///

VERIFIED DERIVATIVE COMPLAINT                                                    -25-

## COUNT VII

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

111.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

112.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sagent in a manner consistent with the operations of a publicly held corporation.

113.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sagent has sustained damages, as alleged herein.

114.    Plaintiff has no adequate remedy at law.

## COUNT VIII

## AGAINST KPMG, LLP FOR BREACH OF CONTRACT

115.    Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth fully herein.

116.    At all times relevant hereto, KPMG and Sagent were parties to written contracts pursuant to which KPMG agreed to provide audit services to Sagent in accordance with Generally Accepted Auditing Standards ("GAAS").

117.    KPMG breached its contracts with Sagent by, among other things, failing to render services in accordance with GAAS and preparing and/or approving financial statements that were not prepared in accordance with GAAP.

118.    As a direct and proximate result of KPMG's breaches of contract, Sagent has sustained damages, as alleged herein.

119.    Plaintiff has no adequate remedy at law.

///

///

///

VERIFIED DERIVATIVE COMPLAINT

-26-

## COUNT IX

### AGAINST KPMG, LLP FOR PROFESSIONAL NEGLIGENCE

120.   Plaintiff incorporates by reference all previous and subsequent paragraphs as if set forth fully herein.

121.   At all times relevant hereto, KPMG, as Sagent's auditor, owed to Sagent the duties of due care and professional competence.

122.   KPMG breached its duties of due care and professional competence by, among other things, failing to render services to Sagent in accordance with GAAS and preparing and/or approving financial statements that were not prepared in accordance with GAAP.

123.   As a direct and proximate result of KPMG's breaches of contract, Sagent has sustained damages, as alleged herein.

124.   Plaintiff has no adequate remedy at law.

**WHEREFORE**, plaintiff demands judgment as follows:

A.   Determining and awarding Sagent treble damages pursuant to California Corporations Code § 25502.5(a) for the Selling Defendants' violations of   California Corporations Code § 25402;

B.   Imposition of a constructive trust in favor of the Company for the amount of profits each of the Selling Defendants received from their sales of Sagent common stock alleged herein;

C.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, abuse of control, and gross mismanagement;

D.   Against KPMG, LLP and in favor of the Company for the amount of damages sustained by the Company as a result of KPMG's breaches of contract and professional negligence;

E.   Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

VERIFIED DERIVATIVE COMPLAINT

-27-

1

## JURY DEMAND

2        Plaintiff demands a trial by jury.

3

4   DATED: February 8, 2002

Respectfully submitted,

5

6   By: _____

7           Robert A. Jigarjian

8   Robert S. Green
Robert A. Jigarjian
**GREEN FAUTH & JIGARJIAN, LLP**
9   235 Pine Street, 15th Floor
San Francisco, California 94104
10  Telephone: (415) 477-6700
Facsimile: (415) 477-6710

11

12  Of Counsel:
**SCHIFFRIN & BARROWAY, LLP**
13  Robert B. Weiser
Eric L. Zagar
14  Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
15  (610) 667-7706

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED DERIVATIVE COMPLAINT

-28-

## **VERIFICATION**

I, RICHARD SUSSMAN, hereby verify that I have reviewed the Complaint and authorized its filing and that the foregoing is true and correct the best of my knowledge, information and belief.

DATED: February 6, 2002

RICHARD SUSSMAN